Miles N. Clark, Esq.
Nevada Bar No. 13848
LAW OFFICES OF MILES N. CLARK, LLC
5510 S. Fort Apache Rd, Suite 30
Las Vegas, NV 89148
Phone: (702) 856-7430
Fax: (702) 552-2370
Email: miles@milesclarklaw.com

*Local Counsel for Plaintiffs*
*Additional Counsel on Signature Page*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEVADA**

|  |  |
|---|---|
| KYLE SLOAN, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>        v.<br><br>VICI PROPERTIES INC. and MGM RESORTS INTERNATIONAL,<br><br>    Defendants. | Case No. 2:23-cv-02042<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Kyle Sloan ("Plaintiff"), individually and on behalf of all others similarly situated, brings this action against Defendants Vici Properties Inc. and MGM Resorts International (collectively, "MGM" or "Defendant") and alleges as follows based on personal knowledge as to his own acts and on investigation conducted by counsel as to all other allegations:

## PARTIES

1.      Plaintiff Kyle Sloan is a citizen and resident of Indiana.

2.      Defendant Vici Properties Inc. is a Maryland corporation with its principal place of business at 535 Madison Avenue, 20th Floor, New York, NY 10022.

1

3.     Defendant MGM Resorts International is a Delaware corporation with its principal place of business at 3600 South Las Vegas Blvd., Las Vegas, NV 89109.

4.     Defendant Vici Properties Inc., through its subsidiaries, owns resorts, casinos, and other entertainment venues throughout the United States, which are operated by Defendant MGM Resorts International. Defendants, together and through their subsidiaries, collectively operate as "MGM."

## JURISDICTION AND VENUE

5.     This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, (2) the action is a class action, (3) there are members of the proposed Class who are diverse from Defendant, and (4) there are more than 100 proposed Class Members.

6.     This Court has personal jurisdiction over Defendants because Plaintiff's claims arose out of Defendants' contacts with this district.

7.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## FACTUAL ALLEGATIONS

### I.  MGM

8.     MGM owns and operates resorts, casinos, and other entertainment venues throughout the United States.

9.     Defendant's guests and customers, like Plaintiff and Class members, provided certain Personal Identifying Information ("PII") to MGM, which is necessary to use or obtain MGM's services.

10.     As a sophisticated hospitality provider with an acute interest in maintaining the confidentiality of the PII entrusted to it, MGM is well-aware of the numerous data breaches that have occurred throughout the United States and its responsibility for safeguarding PII in its possession.

11.     MGM represents to consumers and the public that it possesses robust security features to protect PII and that it takes its responsibility to protect PII seriously. MGM's Privacy Policy states:

> Information maintained in electronic form that is collected by MGM Resorts International and any individual MGM Resort is stored on systems protected by industry standard security measures. These security measures are intended to protect these systems from unauthorized access. No security system is impenetrable and these systems could become accessible in the event of a security breach. We have controls in place that are designed to detect potential data breaches, contain and minimize the loss of data, and conduct forensic investigations of a breach.

> Our staff is required to take reasonable measures to ensure that unauthorized persons cannot view or access your Personal Information. Employees who violate our internal privacy policies are subject to disciplinary action, up to and including termination of employment.

> We cannot enforce or control the security of the computers, electronic devices, or electronic communication method(s) you may use to send e-mails and submit information to us. You are responsible for the security of the computers, electronic devices, and electronic communication methods you use to communicate with us. We are not responsible for the disclosure or interception of information you send us before we receive it.

> As a standard security practice, we take reasonable steps which are generally recognized in the industry to ensure that the communication methods used to support MGM Online Services do not permit connections or communication by methods that have known security weaknesses or vulnerabilities. As such, if you experience trouble using an MGM website, it may be an indication that you need to upgrade your software to a newer version that supports more secure communication methods.

In situations where your Personal Information is collected by third parties under contract with us for performance of their contractual duties and other purposes, we require such third parties to exercise reasonable care to protect that information and restrict the use of your Personal Information to the purposes for which it was provided.[1]

## II.  The Data Breach

12.    On September 11, 2023, MGM experienced what it called a "cybersecurity issue" which resulted in MGM shutting down their networks systemwide ("Data Breach").

13.    On September 14, 2023, the hacker group Scattered Spider publicly claimed responsibility for the Data Breach, claiming that it stole six terabytes of data from MGM.

14.    To gain access to private data, Scattered Spider "uses social engineering to lure users into giving up their login credentials or one-time-password (OTP) codes to bypass multi-factor authentication."[2]

15.    MGM provided further information via a press release on October 5, 2023:

**What Happened?**

MGM Resorts International recently disclosed that the company identified a cybersecurity issue affecting certain of our systems and that our investigation into the issue was ongoing.  On or around September 29, 2023, we determined that an unauthorized third party obtained personal information of some of our customers on September 11, 2023.

**What Information Was Involved?**

The affected information included name, contact information (such as phone number, email address, and postal address), gender, date of birth, and driver's license number.  For a limited number of customers, Social Security number and/or passport number was also affected.  The types of impacted information varied by individual.

---

[1] https://www.mgmresorts.com/en/privacy-policy.html
[2] https://www.reuters.com/technology/moodys-says-breach-mgm-is-credit-negative-disruption-lingers-2023-09-13/

We do not believe customer passwords, bank account numbers, or payment card information was affected by this issue.

**What We Are Doing**

Promptly after learning of this issue, we took steps to protect our systems and data, including shutting down certain systems. We also quickly launched an investigation with the assistance of leading cybersecurity experts and are coordinating with law enforcement. We take the security of our systems and data very seriously and have put in place additional safeguards to further protect our systems.

MGM Resorts is notifying relevant customers by email as required by law and has arranged to provide those customers with credit monitoring and identity protection services at no cost to them. Individuals who receive an email from MGM Resorts about this issue should refer to that email for additional information and instructions for enrolling in these services.

**What You Can Do**

We recommend that you remain vigilant for incidents of fraud and identity theft by reviewing account statements and monitoring your free credit reports. We also recommend that you remain alert for unsolicited communications involving your personal information.

If you are in the U.S. and would like to check your credit report, you are entitled under U.S. law to one free credit report annually from each of the three nationwide consumer reporting agencies. U.S. residents can order a free credit report by visiting www.annualcreditreport.com or calling toll-free at 1-877-322-8228. The U.S. Reference Guide below provides recommendations by the U.S. Federal Trade Commission on the protection of personal information.

We regret any inconvenience this issue may have caused. If you have any questions regarding this matter, please refer to the Frequently Asked Questions below or contact 1-800-621-9437 toll-free Monday through Friday from 8 am – 10 pm Central, or Saturday and Sunday from 10 am – 7 pm Central (excluding major U.S. holidays). Please reference engagement number B105892 when calling.[3]

16.    MGM later provided further information via a letter from the CEO:

---

[3] https://www.mgmresorts.com/en/notice-of-data-breach.html

To Our Valued Customers:

As previously reported, sophisticated criminal actors recently launched a cyberattack on MGM Resorts' IT systems. We responded swiftly, shut down our systems to mitigate risk to customer information, and began a thorough investigation of the attack, including coordinating with federal law enforcement agencies and working with external cybersecurity experts. While we experienced disruptions at some of our properties, operations at our affected properties have returned to normal, and the vast majority of our systems have been restored.  We also believe that this attack is contained.

**The Impact of the Attack**

We have determined that because of our fast, early response, the incident did not result in a compromise of any customer bank account numbers or payment card information.

We do understand that the criminal actors obtained certain personal information belonging to some customers who transacted with us prior to March 2019. This includes name, contact information, gender, date of birth, and driver's license number. The types of impacted information varied by individual. We also believe a more limited number of Social Security numbers and passport numbers were obtained. We have no evidence that the criminal actors have used this data to commit identity theft or account fraud.

**Steps We're Taking to Help**

Protecting your personal information is a responsibility we take extremely seriously.

As part of our remediation efforts, we have rebuilt, restored, and further strengthened portions of our IT environment. We will offer free identity protection and credit monitoring services to individuals who receive an email from us indicating that their information was impacted. We have also established a dedicated call center that can be reached at 800-621-9437 toll-free Monday through Friday from 8 am – 10 pm Central, or Saturday and Sunday from 10 am – 7 pm Central (excluding major U.S. holidays). Please reference engagement number B105892 when calling.  The Company also has set up a webpage at www.mgmresorts.com/importantinformation.[4]

---

[4] https://www.mgmresorts.com/en/letter-from-ceo.html

17.    The Data Breach compromised individuals' name, contact information (such as phone number, email address, and postal address), gender, date of birth, and driver's license number, and for some customers, Social Security number and/or passport number.[5]

18.    MGM did not publicly report how many individuals were affected by the Data Breach.[6] However, on information and belief, the number of affected individuals is likely in the hundreds of thousands or millions of individuals, based on the number of hotels, resorts, and casinos that MGM operates and through which MGM collects PII.

19.    MGM did not state why it was unable to prevent the Data Breach or which security feature failed.

20.    MGM failed to prevent the Data Breach because it did not adhere to commonly accepted security standards and failed to detect that its databases were subject to a security breach.

### III.  Plaintiffs' Experience

21.    Plaintiff is very careful about sharing their sensitive PII and diligently maintains their PII in a safe and secure manner. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

22.    In or around December 2021, Plaintiff provided his PII to MGM as required to obtain services from MGM, including to establish and use his MGM Rewards.

23.    Upon information and belief, Plaintiff's PII was taken by Scattered Spider during the Data Breach.

24.    As a result of the Data Breach, Plaintiff has and will continue to spend time trying to mitigate the consequences of the Data Breach. This includes increased time spent self-monitoring accounts and credit reports to ensure no fraudulent activity has occurred.  For example,

---

[5] *Id.*
[6] https://apps.web.maine.gov/online/aeviewer/ME/40/37d6cb69-b76c-48b5-8d46-d68bb59a5df5.shtml

Plaintiff checks his bank accounts and credit cards every day to look for unauthorized or suspicious activity. Plaintiff also checks his Experian ID theft monitoring account routinely since the Data Breach. Plaintiff also has noticed an increase in spam calls since the Data Breach. This time has been lost forever and cannot be recaptured.

25.    The harm caused to Plaintiff cannot be undone.

26.    Plaintiff further suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that Plaintiff entrusted to MGM, which was compromised in and as a result of the Data Breach.

27.    Plaintiff suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of their privacy.

28.    Plaintiff has suffered imminent and impending injury arising from the present and ongoing risk of fraud, identity theft, and misuse resulting from their PII being placed in the hands of cybercriminals.

29.    Future identity theft monitoring is reasonable and necessary and such services will include future costs and expenses.

30.    Plaintiff has a continuing interest in ensuring that his PII, which, upon information and belief, remains in MGM's control, is protected, and safeguarded from future breaches.

**IV. Injuries to Plaintiff and Class Members**

31.    As a direct and proximate result of MGM's actions and omissions in failing to protect Plaintiff and Class Members' PII, Plaintiff and Class Members have been injured.

32.    Plaintiff and Class Members have been placed at a substantial risk of harm in the form of credit fraud or identity theft and have incurred and will likely incur additional damages,

including spending substantial amounts of time monitoring accounts and records, in order to prevent and mitigate credit fraud, identity theft, and financial fraud.

33.    In addition to the irreparable damage that may result from the theft of PII, identity theft victims must spend numerous hours and their own money repairing the impacts caused by a breach. After conducting a study, the Department of Justice's Bureau of Justice Statistics found that identity theft victims "reported spending an average of about 7 hours clearing up the issues" and resolving the consequences of fraud in 2014.[7]

34.    In addition to fraudulent charges and damage to their credit, Plaintiff and Class Members may spend substantial time and expense (a) monitoring their accounts to identify fraudulent or suspicious charges; (b) cancelling and reissuing cards; (c) purchasing credit monitoring and identity theft prevention services; (d) attempting to withdraw funds linked to compromised, frozen accounts; (e) removing withdrawal and purchase limits on compromised accounts; (f) communicating with financial institutions to dispute fraudulent charges; (g) resetting automatic billing instructions and changing passwords; (h) freezing and unfreezing credit bureau account information; (i) cancelling and re-setting automatic payments as necessary; and (j) paying late fees and declined payment penalties as a result of failed automatic payments.

35.    Additionally, Plaintiff and Class Members have suffered or are at increased risk of suffering from, *inter alia*, the loss of the opportunity to control how their PII is used, the diminution in the value or use of their PII, and the loss of privacy.

### V.    Securing PII and Preventing Breaches

36.    MGM could have prevented this Data Breach by properly securing and encrypting the PII of Plaintiff and Class Members. Alternatively, MGM could have destroyed the data they

---

[7] U.S. Dep't of Justice, *Victims of Identity Theft, 2014* (Nov. 13, 2017), http://www.bjs.gov/content/pub/pdf/vit14.pdf.

no longer had a reasonable need to maintain or only stored data in an Internet-accessible environment when there was a reasonable need to do so.

37.    MGM's negligence in safeguarding the PII of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

38.    Despite the prevalence of public announcements of data breach and data security compromises, MGM failed to take appropriate steps to protect the PII of Plaintiff and Class Members from being compromised.

39.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[8] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[9]

40.    The ramifications of MGM's failure to keep secure the PII of Plaintiff and Class Members are long lasting and severe. Once PII is stolen, particularly Social Security numbers, fraudulent use of that information and damage to victims may continue for years.

**VI.    The Value of PII**

41.    It is well known that PII, and social security numbers and financial account information in particular, is an invaluable commodity and a frequent target of hackers.

---

[8] 17 C.F.R. § 248.201 (2013).
[9] *Id.*

42.    According to Javelin Strategy & Research, in 2017 alone over 16.7 million individuals were affected by identity theft, causing $16.8 billion to be stolen.[10]

43.    People place a high value not only on their PII, but also on the privacy of that data. This is because identity theft causes "significant negative financial impact on victims" as well as severe distress and other strong emotions and physical reactions.[11]

44.    People are particularly concerned with protecting the privacy of their financial account information and social security numbers, which are the "secret sauce" that is "as good as your DNA to hackers."[12] There are long-term consequences to data breach victims whose social security numbers are taken and used by hackers. Even if they know their social security numbers have been accessed, Plaintiff and Class Members cannot obtain new numbers unless they become a victim of social security number misuse. Even then, the Social Security Administration has warned that "a new number probably won't solve all [] problems . . . and won't guarantee . . . a fresh start."[13]

45.    The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[14] Experian reports that a stolen credit or debit

---

[10] Javelin Strategy & Research, *Identity Fraud Hits All Time High With 16.7 Million U.S. Victims in 2017, According to New Javelin Strategy & Research Study* (Feb. 6, 2018), https://www.javelinstrategy.com/press-release/identity-fraud-hits-all-time-high-167-million-us-victims-2017-according-new-javelin.

[11] Identity Theft Resource Center, *Identity Theft: The Aftermath 2017*, https://www.ftc.gov/system/files/documents/public_comments/2017/10/00004-141444.pdf.

[12] Cameron Huddleston, *How to Protect Your Kids From the Anthem Data Breach*, Kiplinger, (Feb. 10, 2015), https://www.kiplinger.com/article/credit/T048-C011-S001-how-to-protect-your-kids-from-the-anthem-data-brea.html.

[13] Social Security Admin., *Identity Theft and Your Social Security Number*, at 6-7, https://www.ssa.gov/pubs/EN-05-10064.pdf.

[14] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

card number can sell for $5 to $110 on the dark web.[15] Criminals can also purchase access to entire

company data breaches from $900 to $4,500.[16]

46.     Social Security numbers, for example, are among the worst kind of personal

information to have stolen because they may be put to a variety of fraudulent uses and are difficult

for an individual to change. The Social Security Administration stresses that the loss of an

individual's Social Security number, as is the case here, can lead to identity theft and extensive

financial fraud:

> A dishonest person who has your Social Security number can use it
> to get other personal information about you. Identity thieves can use
> your number and your good credit to apply for more credit in your
> name. Then, they use the credit cards and don't pay the bills, it
> damages your credit. You may not find out that someone is using
> your number until you're turned down for credit, or you begin to get
> calls from unknown creditors demanding payment for items you
> never bought. Someone illegally using your Social Security number
> and assuming your identity can cause a lot of problems.[17]

47.     What is more, it is no easy task to change or cancel a stolen Social Security number.

An individual cannot obtain a new Social Security number without significant paperwork and

evidence of actual misuse. In other words, preventive action to defend against the possibility of

misuse of a Social Security number is not permitted; an individual must show evidence of actual,

ongoing fraud activity to obtain a new number.

48.     Even then, a new Social Security number may not be effective. According to Julie

Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the

---

[15] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017,
https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.
[16] *In the Dark*, VPNoverview, 2019, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/.
[17] Social Security Administration, *Identity Theft and Your Social Security Number*, https://www.ssa.gov/pubs/EN-05-10064.pdf.

new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[18]

49.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

50.    This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[19]

51.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

52.    The fraudulent activity resulting from the Data Breach may not come to light for years.

53.    There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years.

---

[18] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft.

[19] Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

> As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[20]

54.    At all relevant times, MGM knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members, including Social Security numbers, and of the foreseeable consequences that would occur if their data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

55.    Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiff and Class Members are incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

56.    MGM was, or should have been, fully aware of the unique type and the significant volume of data contained in the PII that MGM stored unencrypted, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

57.    The injuries to Plaintiff and Class Members were directly and proximately caused by MGM's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

## VII.    Industry Standards for Data Security

58.    In light of the numerous high-profile data breaches targeting companies like Target, Neiman Marcus, eBay, Anthem, Deloitte, Equifax, Marriott, T-Mobile, and Capital One, MGM is, or reasonably should have been, aware of the importance of safeguarding PII, as well as of the foreseeable consequences of its systems being breached.

59.    Security standards commonly accepted among businesses that store PII using the internet include, without limitation:

---

[20] *Report to Congressional Requesters*, GAO, at 29 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.

a.      Maintaining a secure firewall configuration;

b.      Monitoring for suspicious or irregular traffic to servers;

c.      Monitoring for suspicious credentials used to access servers;

d.      Monitoring for suspicious or irregular activity by known users;

e.      Monitoring for suspicious or unknown users;

f.      Monitoring for suspicious or irregular server requests;

g.      Monitoring for server requests for PII;

h.      Monitoring for server requests from VPNs; and

i.      Monitoring for server requests from Tor exit nodes.

60.     The U.S. Federal Trade Commission ("FTC") publishes guides for businesses for cybersecurity[21] and protection of PII[22] which includes basic security standards applicable to all types of businesses.

61.     The FTC recommends that businesses:

a.      Identify all connections to the computers where you store sensitive information.

b.      Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks.

c.      Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business.

d.      Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine.

---

[21] Start with Security: A Guide for Business, FTC (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.
[22] Protecting Personal Information: A Guide for Business, FTC (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting personalinformation.pdf.

e. Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hacker attacks.

f. Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet.

g. Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically.

h. Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day.

i. Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business' network, the transmission should be investigated to make sure it is authorized.

62. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.[23]

---

[23] Federal Trade Commission, *Privacy and Security Enforcement: Press Releases*, https://www.ftc.gov/news-events/media-resources/protecting-consumer-privacy/privacy-security-enforcement.

63.     Because MGM was entrusted with PII, they had, and have, a duty to keep the PII secure.

64.     Plaintiff and Class Members reasonably expect that when their PII is provided to a sophisticated business for a specific purpose, that business will safeguard their PII and use it only for that purpose.

65.     Nonetheless, MGM failed to prevent the Data Breach. Had MGM properly maintained and adequately protected its systems, it could have prevented the Data Breach.

## CLASS ALLEGATIONS

66.     This action is brought as a class action pursuant to Fed. R. Civ. P. 23.

67.     The proposed Class is defined as follows:

> **Nationwide Class:** All persons whose PII was maintained on MGM's servers that were compromised in the Data Breach.

68.     The proposed Class excludes the following: MGM, its affiliates, and its current and former employees, officers and directors, and the Judge assigned to this case.

69.     The proposed Class definition may be modified, changed, or expanded based upon discovery and further investigation.

70.     *Numerosity*: The proposed Class is so numerous that joinder of all members is impracticable, evidenced by the large number of individuals presently known to have been injured by MGM's conduct. The proposed Class is ascertainable by records in the possession of MGM or third parties.

71.     *Commonality*: Questions of law or fact common to the proposed Class include, without limitation:

> a.     Whether MGM owed a duty or duties to Plaintiff and Class Members to exercise due care in collecting, storing, safeguarding, and obtaining their PII;

     b.     Whether MGM breached that duty or those duties;

     c.     Whether MGM failed to establish appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of records to protect against known and anticipated threats to security;

     d.     Whether the security provided by MGM was satisfactory to protect PII as compared to industry standards;

     e.     Whether MGM misrepresented or failed to provide adequate information regarding the type of security practices used;

     f.     Whether MGM knew or should have known that it did not employ reasonable measures to keep Plaintiff and Class Members' PII secure and prevent loss or misuse of that PII;

     g.     Whether MGM acted negligently in connection with the monitoring and protecting of Plaintiff's and Class Members' PII;

     h.     Whether MGM's conduct was intentional, willful, or negligent;

     i.     Whether Plaintiff and Class Members suffered damages as a result of MGM's conduct, omissions, or misrepresentations; and

     j.     Whether Plaintiff and Class Members are entitled to injunctive, declarative, and monetary relief as a result of MGM's conduct.

72.     *Typicality*: Plaintiff's claims are typical of the claims of proposed Class Members. Plaintiff and proposed Class Members were injured and suffered damages in substantially the same manner, have the same claims against MGM relating to the same course of conduct, and are entitled to relief under the same legal theories.

73.     *Adequacy*: Plaintiff will fairly and adequately protect the interests of the proposed Class and have no interests antagonistic to those of the proposed Class. Plaintiff's counsel are experienced in the prosecution of complex class actions, including actions with issues, claims, and defenses similar to the present case.

74.     *Predominance and superiority*: Questions of law or fact common to proposed Class Members predominate over any questions affecting individual members. A class action is superior

to other available methods for the fair and efficient adjudication of this case because individual joinder of all members of the proposed Class is impracticable and the amount at issue for each proposed Class Member would not justify the cost of litigating individual claims. Should individual proposed Class Members be required to bring separate actions, this Court would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court. There are no known difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

75. Accordingly, this class action may be maintained pursuant to Fed. R. Civ. P. 23(b)(3).

76. MGM has acted, and refused to act, on grounds generally applicable to the proposed Class, thereby making appropriate final equitable relief with respect to the proposed Class as a whole.

77. Accordingly, this class action may be maintained pursuant to Fed. R. Civ. P. 23(b)(2).

## CAUSES OF ACTION

### COUNT I

### NEGLIGENCE
### (on behalf of the Class)

78. All preceding paragraphs are incorporated herein by reference as though fully set forth herein.

79.    MGM owed a duty of care to Plaintiff and Class Members to use reasonable means to secure and safeguard the entrusted PII, to prevent its unauthorized access and disclosure, to guard it from theft, and to detect any attempted or actual breach of its systems. These common law duties existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices. In fact, not only was it foreseeable that Plaintiff and Class Members would be harmed by the failure to protect their PII because hackers routinely attempt to steal such information and use it for nefarious purposes, but MGM knew that it was more likely than not Plaintiff and Class Members would be harmed by such exposure of their PII.

80.    MGM's duties to use reasonable security measures also arose as a result of the special relationship that existed between MGM, on the one hand, and Plaintiff and Class Members, on the other hand. The special relationship arose because MGM was entrusted with Plaintiff's and Class Members' PII, MGM accepted and held the PII, and MGM represented that the PII would be kept secure pursuant to their data security policies. MGM alone could have ensured that their data security systems and practices were sufficient to prevent or minimize the data breach.

81.    MGM's duties to use reasonable data security measures also arose under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect PII. Various FTC publications and data security breach orders further form the basis of MGM's duties. In addition, individual states have enacted statutes based upon the FTC Act that also created a duty.

82.    MGM's violations of Section 5 of the FTC Act constitute negligence per se.

83.     MGM breached the aforementioned duties when it failed to use security practices that would protect Plaintiff's and Class Members' PII, thus resulting in unauthorized third-party access to the Plaintiff and Class Members' PII.

84.     MGM further breached the aforementioned duties by failing to design, adopt, implement, control, manage, monitor, update, and audit their processes, controls, policies, procedures, and protocols to comply with the applicable laws and safeguard and protect Plaintiff and Class Members' PII within their possession, custody, and control.

85.     As a direct and proximate cause of failing to use appropriate security practices, Plaintiff and Class Members' PII was disseminated and made available to unauthorized third parties.

86.     MGM admitted that Plaintiff and Class Members' PII was wrongfully disclosed as a result of the breach.

87.     The breach caused direct and substantial damages to Plaintiff and Class Members, as well as the possibility of future and imminent harm through the dissemination of their PII and the greatly enhanced risk of credit fraud or identity theft.

88.     By engaging in the forgoing acts and omissions, MGM committed the common law tort of negligence. For all the reasons stated above, MGM's conduct was negligent and departed from reasonable standards of care including by, but not limited to: failing to adequately protect the PII; failing to conduct regular security audits; and failing to provide adequate and appropriate supervision of persons having access to Plaintiff and Class Members' PII.

89.     But for MGM's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their PII would not have been compromised.

90.     Neither Plaintiff nor the Class contributed to the breach or subsequent misuse of their PII as described in this Complaint. As a direct and proximate result of MGM's actions and inactions, Plaintiff and Class Members have been put at an increased risk of credit fraud or identity theft, and MGM have an obligation to mitigate damages by providing adequate credit and identity monitoring services. MGM is liable to Plaintiff and Class Members for the reasonable costs of future credit and identity monitoring services for a reasonable period of time, substantially in excess of one year. MGM is also liable to Plaintiff and Class Members to the extent that they have directly sustained damages as a result of identity theft or other unauthorized use of their PII, including the amount of time Plaintiff and Class Members have spent and will continue to spend as a result of MGM's negligence. MGM is also liable to Plaintiff and Class Members to the extent their PII has been diminished in value because Plaintiff and Class Members no longer control their PII and to whom it is disseminated.

## COUNT II

### INVASION OF PRIVACY
### (on behalf of the Class)

91.     All preceding paragraphs are incorporated herein by reference as though fully set forth herein.

92.     Plaintiff and Class Members have objective reasonable expectations of solitude and seclusion in their personal and private information and the confidentiality of the content of PII.

93.     MGM invaded Plaintiff and Class Members' right to privacy by allowing the unauthorized access to their PII and by negligently maintaining the confidentiality of Plaintiff and Class Members' PII, as set forth above.

94.     The intrusion was offensive and objectionable to Plaintiff, the Class, and to a reasonable person of ordinary sensibilities in that Plaintiff and Class Members' PII was disclosed without prior written authorization from Plaintiff and Class Members.

95.     The intrusion was into a place or thing which was private and is entitled to be private, in that Plaintiff and Class Members provided and disclosed their PII to MGM privately with an intention that the PII would be kept confidential and protected from unauthorized disclosure. Plaintiff and Class Members were reasonable to believe that such information would be kept private and would not be disclosed without their written authorization.

96.     As a direct and proximate result of MGM's above acts, Plaintiff and Class Members' PII was viewed, distributed, and used by persons without prior written authorization and Plaintiff and Class Members suffered damages as described herein.

97.     MGM is guilty of oppression, fraud, or malice by permitting the unauthorized disclosure of Plaintiff and Class Members' PII with a willful and conscious disregard of their right to privacy.

98.     Unless and until enjoined, and restrained by order of this Court, MGM's wrongful conduct will continue to cause Plaintiff and Class Members great and irreparable injury in that the PII maintained by MGM can be viewed, printed, distributed, and used by unauthorized persons. Plaintiff and Class Members have no adequate remedy at law for the injuries in that a judgment for the monetary damages will not end the invasion of privacy for Plaintiff and Class Members, and MGM may freely treat Plaintiff and Class Members' PII with sub-standard and insufficient protections.

//

//

## COUNT III

### BREACH OF IMPLIED CONTRACT
### (on behalf of the Class)

99.  Plaintiff hereby incorporates by reference all preceding paragraphs as though fully set forth herein.

100.  MGM invited Plaintiff and the Class to provide their PII to MGM. As consideration for the benefits MGM was to administer, Plaintiff and the Class provided their PII to MGM. When Plaintiff and the Class provided their PII to MGM, they entered into implied contracts by which MGM agreed to protect their PII and only use it solely to administer benefits. As part of the offer, MGM would safeguard the PII using reasonable or industry-standard means.

101.  Accordingly, Plaintiff and the Class accepted MGM's offer to administer benefits and provided MGM their PII.

102.  Plaintiff and the Class fully performed their obligations under the implied contracts with MGM. However, MGM breached the implied contracts by failing to safeguard Plaintiff's and the Class's PII.

103.  The losses and damages Plaintiff and the Class sustained that are described herein were the direct and proximate result of MGM's breaches of its implied contracts with them. Additionally, because Plaintiff and the Class continue to be parties to the ongoing administration and distribution of benefits under the contracts, and because damages may not provide a complete remedy for the breaches alleged herein, Plaintiff and the Class are therefore entitled to specific performance of the contracts to ensure data security measures necessary to properly effectuate the contracts maintain the security of their PII from unlawful exposure.

104.    MGM's conduct as alleged herein also violated the implied covenant of good faith and fair dealing inherent in every contract, and it is liable to Plaintiff and the Class for associated damages and specific performance.

## COUNT IV

### BREACH OF FIDUCIARY DUTY
### (on behalf of the Class)

105.    Plaintiff hereby incorporates by reference all preceding paragraphs as though fully set forth herein.

106.    As alleged above, Plaintiff and the Class had agreements with MGM, both express and implied, that required MGM to keep their PII confidential.

107.    The parties had a fiduciary relationship of trust and confidence such that Plaintiff and the Class relied and depended on MGM to securely maintain their highly sensitive PII, and MGM had a duty of care to safeguard Plaintiff and the Class's PII.

108.    MGM breached that confidence by disclosing Plaintiff's and the Class's PII without their authorization and for unnecessary purposes.

109.    As a result of the data breach, Plaintiff and the Class suffered damages that were attributable to MGM's failure to maintain confidence in their PII.

## COUNT V

### UNJUST ENRICHMENT
### (on behalf of the Class)

110.    All preceding paragraphs are incorporated herein by reference as though fully set forth herein.

111.    Plaintiff and Class Members have an interest, both equitable and legal, in their PII that was conferred upon, collected by, and maintained by MGM and that was ultimately compromised in the data breach.

112.    MGM, by way of their acts and omissions, knowingly and deliberately enriched itself by saving the costs it reasonably should have expended on security measures to secure Plaintiff and Class Members' PII.

113.    MGM also understood and appreciated that the PII pertaining to Plaintiff and Class Members was private and confidential and its value depended upon MGM maintaining the privacy and confidentiality of that PII.

114.    Instead of providing for a reasonable level of security that would have prevented the breach—as is common practice among companies entrusted with such PII—MGM instead consciously and opportunistically calculated to increase its own profits at the expense of Plaintiff and Class Members. Nevertheless, MGM continued to obtain the benefits conferred on it by Plaintiff and Class Members. The benefits conferred upon, received, and enjoyed by MGM were not conferred gratuitously, and it would be inequitable and unjust for MGM to retain these benefits.

115.    Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result. As a result of MGM's decision to profit rather than provide requisite security, and the resulting breach disclosing Plaintiff and Class Members' PII, Plaintiff and Class Members suffered and continue to suffer considerable injuries in the forms of, *inter alia,* attempted identity theft, time and expenses mitigating harms, diminished value of PII, loss of privacy, and increased risk of harm.

116.    Thus, MGM engaged in opportunistic conduct in spite of its duties to Plaintiff and Class Members, wherein it profited from interference with Plaintiff and Class Members' legally protected interests. As such, it would be inequitable, unconscionable, and unlawful to permit MGM to retain the benefits it derived as a consequence of its conduct.

117.     Accordingly, Plaintiff and the Class respectfully request that this Court award relief in the form of restitution or disgorgement in the amount of the benefit conferred on MGM as a result of its wrongful conduct, including specifically, the amounts that MGM should have spent to provide reasonable and adequate data security to protect Plaintiff and Class Members' PII, and compensatory damages.

**COUNT VI**

**BAILMENT**
**(on behalf of the Class)**

118.     Plaintiff hereby incorporates by reference all preceding paragraphs as though fully set forth herein.

119.     Plaintiff and the Class provided, or authorized disclosure of, their PII to MGM.

120.     In allowing their PII to be made available to MGM, Plaintiff and the Class intended and understood that MGM would adequately safeguard their PII.

121.     For its own benefit, MGM accepted possession of Plaintiff's and the Class's PII.

122.     By accepting possession of Plaintiff's and the Class's PII, MGM understood that Plaintiff and the Class expected MGM to adequately safeguard their PII. Accordingly, a bailment (or deposit) was established for the mutual benefit of the parties. During the bailment (or deposit), MGM owed a duty to Plaintiff and the Class to exercise reasonable care, diligence, and prudence in protecting their personal information.

123.     MGM breached its duty of care by failing to take appropriate measures to safeguard and protect Plaintiff's and the Class's personal information, resulting in the unlawful and unauthorized access to and misuse of their PII.

124.    As a direct and proximate result of MGM's breach of its duty, Plaintiff and Class Members suffered consequential damages that were reasonably foreseeable to MGM, including but not limited to the damages set forth above.

125.    As a direct and proximate result of MGM's breach of its duties, the personal information of Plaintiff and the Class entrusted, directly or indirectly, to MGM during the bailment (or deposit) was damaged and its value diminished.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a judgment as follows:

a.    For an order certifying the proposed Class, appointing Plaintiff as Class Representative, and appointing the law firms representing Plaintiff as counsel for the Class;

b.    For compensatory and punitive and treble damages in an amount to be determined at trial;

c.    Payment of costs and expenses of suit herein incurred;

d.    Both pre-and post-judgment interest on any amounts awarded;

e.    Payment of reasonable attorneys' fees and expert fees;

f.    Such other and further relief as the Court may deem proper.

## JURY DEMAND

Plaintiff demands trial by jury.

Dated: December 9, 2023                    Respectfully submitted,

*/s/ Miles N. Clark*
Miles N. Clark
5510 S. Fort Apache Rd., Suite 30
Las Vegas, NV 89148-7700
T: (702) 856-7430
F: (702) 552-2370
miles@milesclarklaw.com

Charles E. Schaffer *
Nicholas J. Elia *
**LEVIN SEDRAN & BERMAN LLP**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone: (215) 592-1500
cschaffer@lfsblaw.com
nelia@lfsblaw.com

Jeffrey S. Goldenberg *
**GOLDENBERG SCHNEIDER, LPA**
4445 Lake Forest Drive, Suite 490
Cincinnati, Ohio 45242
Phone: (513) 345-8291
Facsimile: (513) 345-8294
jgoldenberg@gs-legal.com

Patrick J. Brickman *
**DWORKEN & BERNSTEIN, CO.,
L.P.A.**
60 South Park Place
Painesville, Ohio 44077
Phone: (440) 352-3391 (office)
Facsimile: (440) 352-3469 (fax)
pbrickman@dworkenlaw.com

*Counsel for Plaintiff and Proposed Class*

* *Pro hac vice forthcoming*